# In the United States Court of Federal Claims

BID PROTEST

No. 17-277C

(Filed Under Seal: May 22, 2017 | Reissued: June 1, 2017)*

| | | |
|---|---|---|
| | ) | Keywords: Bid Protest; Tucker Act; 28 |
| CLEVELAND ASSETS, LLC, | ) | U.S.C. § 1491(b); General Services |
| | ) | Administration; Request for Lease |
| Plaintiff, | ) | Proposal; Restrictive Pricing; Prospectus; |
| | ) | 40 U.S.C. § 3307; Prudential Standing; |
| v. | ) | Zone of Interests. |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Robert C. Mackichan, Jr.*, Holland & Knight, Washington, DC, for Plaintiff. *Mary Beth Bosco* and *Gordon Griffin*, Holland & Knight, Washington, DC, *Elizabeth Jochum*, Holland & Knight, Tysons, VA, and *Daniel Hanlon*, Holland & Knight, Miami, FL, Of Counsel.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General. *Thomas Hawkins*, Regional Counsel, General Services Administration, Chicago, IL, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

At issue in this pre-award bid protest is a request for lease proposals (RLP) that the General Services Administration (GSA) issued to secure space to house the Federal Bureau of Investigation's (FBI) Cleveland Field Office. The FBI currently houses its field office in space leased from Plaintiff, Cleveland Assets, LLC (Cleveland Assets). Cleveland Assets is also an offeror for the RLP at issue here.

In Count I of its complaint, Cleveland Assets complains that certain aspects of the RLP are ambiguous and that GSA engaged in unfair and unequal communications with offerors regarding its terms. In Count II, it contends that several terms of the RLP are contrary to law

---

* This Opinion was originally issued under seal on May 22, 2017, and the parties were given the opportunity to request redactions. In light of the suggested redactions, the opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

because the prospectus for which GSA secured Congressional approval as required by 40 U.S.C. § 3307 did not include certain structures that the RLP requires the lessor to provide.

Cleveland Assets' primary claims are set forth in Counts III and IV of its complaint. In Count III it alleges that the rental cap of $26 per square foot included in the RLP is unreasonably low and imposes an undue restriction on competition. In Count IV it makes a related claim that the rental cap "improperly shifts all risk to the contractor and effectively deletes the technical evaluation factors."

Currently before the Court are the parties' cross-motions for judgment on the administrative record, as well as Cleveland Assets' motion to supplement the administrative record with a declaration and a report prepared by a third-party appraiser. As more fully discussed below, Cleveland Assets lacks standing to bring the claims set forth in Counts I and II of its complaint; accordingly, those claims are **DISMISSED** without prejudice for lack of jurisdiction. Further, because the declaration and report proffered by Cleveland Assets are not necessary for effective judicial review, its motion to supplement the administrative record is **DENIED**. Finally, Cleveland Assets' claims that the rental cap GSA set is unreasonable, imposes an undue restriction on competition, and/or shifts undue risk to the contractor lack merit. Its motion for judgment on the administrative record with respect to Counts III and IV is, accordingly, **DENIED,** and the government's cross-motion is **GRANTED**.

**BACKGROUND**

## I.     The Current Lease for the FBI's Cleveland Field Office

The Cleveland Field Office of the FBI is currently housed in a building on Lakeside Avenue in Cleveland, Ohio. Admin. R. (AR) Tab 1 at 2. The FBI is the sole tenant in that building pursuant to a lease between Cleveland Assets and GSA. See id.; id. Tab 6 at 47; id. Tab 42 at 590. The lease covers 121,912 rentable square feet, which includes 108,850 office area square feet. See id. Tab 1 at 2.

The current lease had an initial ten-year term that began February 1, 2002, and was slated to expire January 31, 2012. Compl. ¶ 5, ECF No. 1. The lease has been extended twice, however, and the current extension is set to expire on January 31, 2018. Id.; see also AR Tab 1 at 2. Pursuant to the terms of the extensions, GSA currently pays annual rent at what both parties acknowledge is a penalty rate of [***] per rentable square foot. See Compl. ¶ 5; Def.'s Cross-Mot. for J. on the Admin. R., and Opp'n to Pl.'s Mot. for J. on the Admin. R. (Def.'s Mot.) at 4, ECF No. 27; AR Tab 1 at 2.

## II.     The Prospectus

### A.     Relevant Statutory Provisions

In accordance with 40 U.S.C. § 3307 (and the Anti-Deficiency Act, 31 U.S.C. § 1341), GSA must seek the approval of two Congressional Committees before obligating funds on a

lease whose annual rent exceeds $2.85 million. 40 U.S.C. § 3307(a)(2).[1] Thus, § 3307 provides that, with respect to those leases, "appropriations may be made only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made." Id. § 3307(a). The statute further provides that "[t]o secure consideration for the approval . . . the Administrator of General Services shall transmit to Congress a prospectus of the proposed facility," which must include specific information set out in the statute, including (among other things) "a brief description of the . . . space to be leased" and "an estimate of the maximum cost to the Government of the . . . space to be leased." Id. § 3307(b).

### B.    GSA's Preliminary Work

In light of the requirements of § 3307, sometime in 2009 (or possibly earlier), GSA began the process of preparing a prospectus for a replacement lease for the Cleveland Field Office. Thus, the administrative record in this case contains a number of documents reflecting analyses of the real estate market in Cleveland's business district, whose apparent purpose was to inform GSA's drafting of its prospectus.

First, the record includes a November 3, 2009 appraisal report analyzing the rental market in the central business district of Cleveland. AR Tab 42. The appraisal was prepared for GSA by Karl E. Karth, a certified general real estate appraiser. Id. at 589, 593. Mr. Karth reported that the "asking rents" for office space in "Class A" buildings located in the downtown area specified by GSA ranged from $17.50 to $30 per rentable square foot per year. Id. at 590.[2]

---

[1] The text of 40 U.S.C. § 3307(a)(2) sets this threshold at $1.5 million, but the Administrator of General Services is permitted to adjust this amount "to reflect a percentage increase or decrease in construction costs during the prior calendar year." 40 U.S.C. § 3307(h). The Administrator has done so, and this amount has been set at $2.85 million since 2014. GSA, GSA Annual Prospectus Thresholds, General Services Administration (Apr. 25, 2017), www.gsa.gov/annualprospectus threshold.

[2] According to the CoStar class system—whose nomenclature Mr. Karth used in his report, see AR Tab 52 at 590—a "class A building is an extremely desirable investment-grade property with the highest quality construction and workmanship, materials and systems, significant architectural features, the highest quality/expensive finish and trim, abundant amenities, first rate maintenance and management; usually occupied by prestigious tenants with above average rental rates and in an excellent location with exceptional accessibility." CoStar Realty Information Inc., CoStar Glossary, CoStar, http://www.costar.com/about/costar-glossary (last visited May 15, 2017). In contrast, "a class B building offers more utilitarian space without special attractions," has "ordinary architectural design and structural features," lacks "the abundant amenities and location that a class A building will have," and is "considered to be more of a speculative investment." Id. In the RLP, GSA required offerors to propose "[s]pace . . . in a prime commercial office district with attractive, prestigious, and professional surroundings with a prevalence of modern design and/or tasteful rehabilitation in modern use"—i.e., space in a class A building. See AR Tab 8 at 61.

This rental range, Mr. Karth noted, did not include "consideration . . . for after hour[s] security, cleaning, utilities, etc." Id. Further, according to Mr. Karth, tenant improvement (TI) allowances in the private market ranged from $20 to $40 per rentable square foot. See id. Mr. Karth also provided estimates of operating expenses, real estate taxes, the cost of land, and the cost of parking. Id. at 591. In the conclusion to the appraisal, Mr. Karth opined that total gross rent for the kinds of facilities GSA sought, including the cost of land and parking, ranged from $29.48 to $50.47 per square foot. Id. at 592.

The record also includes copies of a draft prospectus that GSA personnel apparently prepared but which was never approved by GSA's Administrator or submitted to Congress. Id. Tab 43 at 653. The draft prospectus, which is undated and unsigned, describes "a superseding lease of up to 122,000 rentable square feet (rsf) with 175 secured inside and 218 outside parking spaces." Id. It estimates a total annual cost of $5,124,000 and a "Maximum Proposed Rental Rate" of $42 per rentable square foot, which could escalate "by 1.7 percent annually to the effective date of the lease to account for inflation." Id.

Additionally, the record includes an undated document entitled "Lease Project Data Sheet—FY 2010 Program."[3] Id. Tab 40 at 576. This document indicates that GSA intended to secure a replacement lease in the central business district of Cleveland for a building with a maximum of 121,912 rentable square feet that would be occupied by the FBI, and for which the government would pay a maximum rental rate of $50.47 per rentable square foot (the amount identified in Mr. Karth's report as the rate at the high end of the range). Id. In the document, GSA indicated an anticipated annual lease cost of $6,152,898. Id. It included an estimated acquisition schedule that projected a lease award by October 1, 2011. Id.

The record the government has supplied also contains a series of spreadsheets comparing the costs of a new lease with the cost of building a new facility for the FBI in Cleveland. Id. Tab 41. These spreadsheets are untitled and unsigned. See id. at 580–88. They are also undated, but were apparently prepared before 2010, as they include tables that cover the years 2010 through 2039. Id. at 581–86. The first spreadsheet sets forth an estimated rental rate of $42 per rentable square foot for a fully-serviced twenty-year lease. Id. at 580. The underlying documentation that supports or explains this estimate, however, is not contained in the record.

The record also includes another untitled, undated, and unsigned document which the government identifies as an "FBI Lease Scoring" document. Id. Tab 46 at 657. This document reflects an annual rental rate per square foot of $42 for a twenty-year lease, consistent with the rate identified in the spreadsheets at Tab 41 and contained in the draft prospectus. See id.

Finally, the record also includes a document entitled an "Analysis of Replacement Lease Rental Rate." Id. Tab 45 at 656. This document appears to memorialize discussions between GSA and the Office of Management and Budget (OMB) which served as the basis for the rental

---

[3] Although the document is undated, it was apparently prepared before December 15, 2009, as it contains a reference to an occupancy agreement which was "[e]xpected to be signed by 12/15/2009." AR Tab 40 at 577.

rate set forth in the prospectus that GSA ultimately submitted to Congress.[4] It sets forth the same maximum rentable square feet and number of indoor parking spaces as set out in the draft prospectus referenced above. Id. With respect to the cost of rent, however, the document sets forth a proposed annual rental cost, including the cost of parking spaces, of $3,759,615 (as compared to the total rent of $5,124,000 set forth in the draft prospectus). Id. The document identifies an estimated rental rate per square foot of $26 (as opposed to the $42 per square foot rate set forth in the draft prospectus).

The $26 per square foot rental rate was apparently derived on the basis of a list of what the authors of the document identified as "costs estimated by preliminary market analysis by staff appraiser and CoSTAR." Id. The list of such estimated costs (and deductions) reads as follows:

| | |
|---|---|
| Base Rent Includes [sic] Operating Expenses | $23.50 |
| Tenant improvement deduct taken for existing location | ($5.40) |
| Tenant improvement allowance for new term in existing location | $0.82 |
| Land Component | $6.63 |
| | $25.55 |
| Total Rent per RSF rounded up to nearest $1.00 | $26.00 |

Id.[5]

## C. **The Final Prospectus**

On December 21, 2010, GSA's Administrator approved a revised prospectus. Id. Tab 51 at 674–75. GSA described the prospective lease as encompassing "122,000 rentable square feet (rsf) with 175 secured inside parking spaces for the Federal Bureau of Investigation." Id. at 674. Consistent with the "Analysis of Replacement Lease Rental Rate," discussed above, GSA now proposed a total annual rental cost, including parking, of $3,759,615. Id. In addition, it proposed

---

[4] The table of contents for the administrative record identifies this document as one that was prepared by OMB. In its brief, the government asserts that the document was prepared through a collaboration between GSA and OMB. Def.'s Mot. at 5. The precise provenance of the document is unclear from its face, but it contains the line "Federal Bureau of Investigation, Cleveland Ohio" below the title. AR Tab 45 at 656.

[5] At the oral argument in this case, neither party was able to authoritatively explain whether the line in the document identifying the base rent (including operating expenses) represented the then-current rental rate for the field office absent the penalty, or perhaps represented a derivative of that rate to account for the fact that the proposed lease was to have a twenty-year term, compared to the initial lease's ten-year term. In any event, the calculations clearly reflect a rate that was somehow derived from Cleveland Assets' original lease agreement with GSA, because the analysts deducted the TI allowance charged at the FBI's "existing location" from the line entitled "base rent includ[ing] operating expenses" (and then added back in a figure that was to constitute the TI allowance for a "new term in [the] existing location").

5

a "Maximum Proposed Rental Rate" of $26 per rentable square foot, with an escalation clause to account for inflation. Id.[6]

### D.    Congressional Committee Approval

On July 13, 2011, the United States Senate Committee on Environment and Public Works adopted a resolution approving the prospectus. Id. Tab 52 at 677. In that resolution, the Committee approved a "prospectus . . . for a replacement lease of up to a total maximum of 122,000 rentable square feet of space, with 175 secured inside parking spaces, for the Federal Bureau of Investigation . . . at a maximum proposed rental rate of $26 per rentable square foot." Id.

On September 8, 2011, the United States House of Representatives Committee on Transportation and Infrastructure adopted its resolution approving the prospectus. Id. Tab 53 at 678–79. The House Committee stated that "appropriations are authorized for a replacement lease of up to 122,000 rentable square feet of space with 175 secured inside parking spaces for the Federal Bureau of Investigation at a proposed total annual cost of $3,759,615." Id. at 678.

## III.    GSA's Pre-RLP Activities

On March 10, 2016, GSA issued a request for expressions of interest in leasing a building for the FBI. Id. Tab 3 at 41–43 (posting on Federal Business Opportunities Website); see also id. Tab 4 (advertisement in Crain's Cleveland Business); see also id. Tab 5 (advertisement in Cleveland Plain Dealer). It described the space it was seeking as a "single tenant facility for the sole use of the Government" in the central business district of Cleveland. Id. Tab 3 at 41–42. GSA also informed potential lessors of space requirements, the length of the anticipated lease, and certain other site requirements such as the building's set-back requirement. Id. at 42. Parties wishing to express interest in competing for such a lease were to provide contact information, drawings and square footage information for the proposed building, the building's availability, and information on its energy features and services by March 31, 2016. Id. at 41–42.

In response, GSA received [***] expressions of interest. See id. Tab 1 at 7; see also id. Tab 2 at 14. It determined that [***] of the properties identified could not meet the government's requirements, but that [***] were sufficient to proceed to a market survey of the properties. See id. Tab 1 at 7; see also id. Tab 2 at 14. Therefore, on July 26, 2016, "a physical market survey of all [***] potential offerors was conducted by GSA and FBI to further determine suitability." Id. Tab 2 at 14. The [***] properties surveyed included the FBI's current lease location in the building owned by Cleveland Assets. Id. Tab 6 at 47. GSA and the FBI then prepared a report on August 1, 2016, describing the site visits. Id. at 46–49. They noted positives and negatives for

---

[6] Throughout its briefs, Cleveland Assets refers to the maximum rental rate as $26 per square foot. E.g., Mem. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 15, ECF No. 23-1. The government, however, refers to this escalation clause to assert that the maximum rent per square foot under the prospectus is now $28.77. Def.'s Mot. at 2 n.2. The escalation is not relevant to the Court's substantive analysis and the Court will refer to the maximum rental rate as $26 for ease of reference.

each building and made determinations as to whether each building's owner would be provided a copy of the RLP and requested to submit an offer. See id. at 47–48. The government concluded that [***] of the [***] properties, including the existing site, were acceptable and that GSA would directly invite their owners (among them Cleveland Assets) to submit proposals. Id.; see also id. Tab 1 at 7; id. Tab 2 at 14 (Source Selection Plan noting that "[***] of the [***] properties . . . met the stated requirements or could reasonably be expected to meet those requirements" and that those [***] properties would be provided a copy of the RLP).

## IV.    The RLP

The solicitation at issue in this case—Request for Lease Proposals No. 6OH0241—was posted on December 7, 2016, more than five years after the Senate and House Committees approved the final prospectus. Id. Tab 8 at 57–60.[7] In section 1.02 of the RLP, GSA described the space it was seeking: "a minimum of <u>108,850</u> to a maximum of <u>114,290</u> of American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) Office Area (ABOA) square feet." Id. at 60 (emphasis in original). The RLP also required offerors to include 175 "structured/inside parking spaces" and told offerors to "include the cost of this parking as part of the rental consideration." Id. The lease term would be a "firm term" of twenty years. Id.

GSA informed offerors it was seeking "a fully serviced, turnkey Lease with rent that covers all lessor costs, including all shell upgrades, TIs, operating costs, real estate taxes, and security upgrades."[8] Id. at 62. It also stated that the "RLP is subject to an approved Prospectus issued in accordance with 40 USC § 3307" and that GSA would "only award a lease pursuant to this RLP if the offered rental rate does not exceed the Congressionally-imposed rent limitation set forth in the Prospectus," which was, as noted above, $26 per square foot. Id. at 70.

In the RLP, GSA indicated its intent to establish a competitive range "based on cost or price and other factors." Id. at 75. GSA stated that it might conduct negotiations with offerors in the competitive range over any "aspect of the offer as deemed necessary," and that offerors would be permitted to submit revisions to their offers following these negotiations. Id. The lease would ultimately be awarded "to the responsible Offeror whose offer will be most advantageous to the Government." Id.

GSA provided offerors with a list of evaluation factors, the combination of which were "significantly more important than price." Id. Those factors were 1) "Technical Quality";

---

[7] According to Cleveland Assets, GSA issued an initial request for lease proposals for the FBI building on December 6, 2013, after which Cleveland Assets filed a protest that resulted in GSA issuing an amended RLP. Pl.'s Mem. at 5. Thereafter, Cleveland Assets asserts, GSA cancelled the amended RLP and advised Cleveland Assets that "its needs had changed," and also allegedly "orally advis[ed]" Cleveland Assets that it "intended to go back to Congress for a new Prospectus." Id.

[8] TIs are "the finishes and fixtures that typically take Space from the 'shell' condition to a finished, usable condition." AR Tab 8 at 73.

2) "Site Characteristics and Security Criteria"; 3) the "Offeror's Qualifications and Past Performance"; and 4) the "Offeror's Past Performance." Id. Additionally, GSA warned offerors that "[i]n order for the proposal to be considered responsive, it must include the following: . . . 2) [t]he rental rate proposed must fall under the prospectus threshold." Id. at 77. Offers were due by February 28, 2017. Id. at 57.

## V.     Additional Rental Rate Analyses

On February 23, 2017, for reasons that are not apparent from the record, GSA prepared updated analyses of the prospectus's rental cap (as increased by the escalation clause of the prospectus to $28.77 for fiscal year 2018 as discussed below), as well as updated analyses of the rental market in the central business district of Cleveland. See id. Tabs 54–58. These analyses involved determining the average rental rates for commercial real estate in downtown Cleveland using two sets of data: 2016 year-end market information and current market rate information as of February 23, 2017. See id. Tab 54 at 680–81. GSA also calculated TI costs, interest rates, and operating expenses. Id.

First, based on the 2016 year-end market information obtained from a number of commercial databases, GSA calculated an "Updated Levelized" or "Resulting Prospectus" rate of $27.59 per square foot, and a rate of $28.77 per square foot for fiscal year 2018. Id. at 680. In reaching these conclusions, GSA also determined that based on Reis, CBRE, and CoStar average market rates for office buildings in downtown Cleveland, the "target rate" for its new lease was $21.30 per rentable square foot, based on rental rate averages from the three databases of $21, $20.88, and $22.01, respectively. See id. at 681.[9]

When GSA performed these same calculations using the current market rates as of February 23, 2017, it calculated an updated prospectus rate of $26.10, and a rate of $28.77 for fiscal year 2018. See id. Tab 55 at 718–20. It also found that its target rate was $20.04 per rentable square foot, based on average asking rental rates of $21, $20.88, and $18.25 for office buildings in downtown Cleveland, from Reis, CBRE, and CoStar, respectively. See id. at 719.

Additionally, GSA gathered income and expense information for buildings in Cleveland, which included the average, median, low, and high costs for expenses such as utilities and security. Id. Tab 56 at 755. Following that, it put together a "Lease Comps Summary" report utilizing the CoStar database. Id. Tab 57 at 756. This market report revealed that the "Gross Asking Rent Per SF" for office buildings in Cleveland ranged from $15 to $28.50. See id. The average was $22.05. Id.

## VI.     This Action

On February 28, 2017, the last day proposals could be submitted to GSA, Cleveland Assets filed its complaint in this court. ECF No. 1. Along with its complaint, Cleveland Assets

---

[9] Each of these is a commercial real estate database. CoStar Realty Information Inc., CoStar, http://www.costar.com/ (last visited May 12, 2017); Reis, Inc., Reis, https://www.reis.com/ (last visited May 12, 2017); CBRE, https://www.cbre.com/ (last visited May 12, 2017).

also filed a motion for a temporary restraining order or preliminary injunction. ECF No. 4. On March 1, 2017, the Court denied the motion for a temporary restraining order or preliminary injunction on mootness grounds, based on the government's agreement not to conduct discussions or evaluate offers before May 15, 2017. Order, ECF No. 10.[10]

On March 29, 2017, Cleveland Assets filed its motion for judgment on the administrative record. ECF No. 23. It also filed a motion to supplement the administrative record with a declaration and a report prepared by a third party real estate appraiser. ECF No. 25. On April 14, 2017, the government filed an opposition to Cleveland Assets' motion to supplement and a cross-motion for judgment on the administrative record. ECF Nos. 26–27. The Court heard oral argument on all pending motions on May 9, 2017. See Order, ECF No. 33.

## DISCUSSION

### I.    Subject Matter Jurisdiction

#### A.    The Tucker Act

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

#### B.    Standing

A party invoking this Court's bid protest jurisdiction "bears the burden of establishing [the] elements [of standing]." Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)) (alterations in original). To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359. A "protest will, by its nature, dictate the necessary factors for a 'direct economic

---

[10] The government subsequently agreed to an additional delay of nine days, to May 24, 2017.

interest.'" Sys. Application & Techs., Inc., 691 F.3d at 1382. In a pre-award protest, like this one, the focus is on whether the protester has demonstrated a non-trivial competitive injury which can be addressed by judicial relief. See Weeks Marine, Inc., 575 F.3d at 1361–62. The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)).

### 1.    Standing to Challenge the RLP's Rental Cap

In Counts III and IV of its complaint, Cleveland Assets alleges that the rental cap of $26 per square foot included in the RLP is unreasonably low, imposes an undue restriction on competition, and "improperly shifts all risk to the contractor," thereby "effectively delet[ing] the technical evaluation factors." Compl. at 10–11. According to Cleveland Assets, the rental cap hampers its ability to compete for the lease because it is allegedly not possible for a lessor to both comply with the rental cap and also meet the RLP's requirements. See id. at 10–12.

These claims are sufficient to establish a non-trivial competitive injury which can be addressed by judicial relief, in the form of an injunction prohibiting the use of the rental cap to which Cleveland Assets objects. Accordingly, Cleveland Assets is an interested party and has standing to bring Counts III and IV of its complaint.

### 2.    Standing to Challenge the Allegedly Unfair and Unequal Communications with Offerors

In Count I of its complaint, Cleveland Assets alleges that GSA had selective communications with prospective offerors about the terms of the solicitation, in violation of GSAR 570.302(c) (providing that the description of requirements in an RLP "must promote full and open competition") and GSAR 570.303-4(a) (stating that "[i]f the Government's requirements change, either before or after receipt of proposals," then GSA must issue an amendment to the solicitation). Id. ¶¶ 23–25. The communication identified in the complaint occurred when Cleveland Assets inquired about what appeared to be a discrepancy between the RLP's requirement that the lessor supply an Automobile Annex, and the Room Data Matrix supplied with the RLP, which did not include square footage for the Annex. Id. ¶ 24. Cleveland Assets complains that although GSA advised it not to include any Annex in its proposal, it did not issue an amendment to the RLP reflecting this clarification. Id. Therefore, according to Cleveland Assets, other "[o]fferors are . . . left on their own to determine whether the Automobile Annex is a requirement." Id.; see also Pl.'s Mem. at 24–25 ("[A]ny offeror outside of Plaintiff would have no idea that an Automobile Annex is no longer a required part of proposals."). As is readily apparent, this claim alleges a competitive injury, but an injury to other offerors, not to Cleveland Assets, the party to whom GSA communicated the clarification. Compl. ¶ 24. Cleveland Assets lacks standing, therefore, to bring a claim based on this communication.

In its briefs, Cleveland Assets identifies other supposed improper pre-proposal communications between GSA and other offerors. It asserts, for example, that GSA informed one offeror that a receiving dock could be "at grade," rather than at a height listed in one portion

of the RLP, and that a purchase agreement was sufficient to demonstrate ownership of the property being offered. Pl.'s Mem. at 25. Cleveland Assets also complains that GSA provided clarifications to prospective offerors regarding other requirements in the RLP, including, among other things, that certain security features and checkpoints were no longer required and that "stacking diagrams" provided during a pre-proposal conference would satisfy the RLP's requirement for "test fit plans." Id. at 25–26.

Cleveland Assets contends that the exchanges between GSA and prospective offerors "demonstrate the ambiguities in the RLP and the clear benefit all offerors would have gained from the clarifications provided to [two other offerors] during these exchanges." Id. at 26. But Cleveland Assets never asserts, much less explains, why any of these exchanges actually undermined its competitive position.

In short, Cleveland Assets has failed to demonstrate that any of the challenged communications identified in its complaint or briefs resulted in a non-trivial competitive injury to it. For this reason, it is not an interested party and it lacks standing to bring Count I of its complaint. Count I is therefore **DISMISSED** without prejudice for lack of subject matter jurisdiction.

### 3. Standing to Challenge Alleged Violation of 40 U.S.C. § 3307

In Count II of its complaint, Cleveland Assets alleges that the RLP is unlawful because it exceeds the scope of GSA's leasing authority under 40 U.S.C. § 3307. Compl. ¶¶ 27–30. Specifically, according to Cleveland Assets, the RLP solicits proposals for a lease that allegedly includes additional space and structures not identified in the prospectus GSA submitted to the Congressional Committees for the FBI's new lease.[11] Id.

Although not entirely clear, it appears that Cleveland Assets alleges that it is injured by GSA's illegal assertion of authority to solicit the new lease. Presumably, were the Court to agree that the RLP is unlawful, then GSA would either be required to issue a new RLP that does not include the structures to which Cleveland Assets objects, or else go back to Congress seeking approval of a new prospectus. In the meantime, the FBI would effectively be required to remain in the facility that it currently leases from Cleveland Assets.

It is unclear to the Court whether these allegations are sufficient to establish the existence of a non-trivial competitive injury caused by GSA's claimed violation of § 3307. But even assuming that such an injury has been alleged (so that Cleveland Assets is an "interested party" within the meaning of 28 U.S.C. § 1491(b)), Cleveland Assets must also establish that its claim falls within the zone of interests protected by § 3307. See Bennett v. Spear, 520 U.S. 154 (1997); Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150 (1970). As counsel for Cleveland Assets properly conceded at oral argument, however, see Oral Argument at

---

[11] Cleveland Assets alleges that the unauthorized structures include a visitor screening facility, an automobile annex, and a concrete foundation for a hazardous materials container. Pl.'s Mem. at 11; see also Compl. ¶ 29.

2:03:50pm, its claim based on § 3307 does not survive that inquiry. Therefore, Cleveland Assets lacks standing to make that claim.

The Court's analysis is guided by the Supreme Court's decision in Bennett v. Spear. As the Court observed in that case, "[t]he question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" Bennett, 520 U.S. at 162 (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). The "immutable requirements of Article III," the Court explained, are that the plaintiff demonstrate an "injury in fact" that is "fairly traceable" to the defendant's action, and which will likely be redressed by a favorable decision. Id. (internal quotations omitted). These immutable requirements are satisfied under § 1491(b) where a protester is an "interested party"—i.e., "an actual or prospective bidder [or offeror]" who possesses a "direct economic interest" in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382.

Beyond these constitutional minimums, however, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Bennett, 520 U.S. at 162 (citing Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474–75 (1982)). These "'judicially self-imposed limits on the exercise of federal jurisdiction,' are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" Id. (first quoting Allen v. Wright, 468 U.S. 737, 751 (1984), then quoting Warth, 422 U.S. at 498). Among them is the requirement that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Id.

"[U]nlike their constitutional counterparts," prudential requirements such as the zone of interests requirement "can be modified or abrogated by Congress." Id. But because "Congress legislates against the background of [the Supreme Court's] prudential standing doctrine," the requirement "applies unless it is expressly negated." Id. at 163 (citing Block v. Cmty. Nutrition Institute, 467 U.S. 340, 345–48 (1984)). Because the Court's bid protest jurisdiction is premised on § 1491(b) of the Tucker Act, the first question before the Court is whether Congress, in enacting 28 U.S.C. § 1491(b), "expressly negated" the zone of interests requirement with respect to any violation of a statute or regulation that arguably occurs in connection with a procurement.

The resolution of this question is also informed by Bennett. That case involved the "citizen suit" provision of the Endangered Species Act, 16 U.S.C. § 1540(g), which states that "any person may commence a civil suit" to enforce certain provisions of the act. See 520 U.S. at 164–65 & n.2 (quoting 16 U.S.C. § 1540(g)). The Supreme Court concluded that the "citizen suit" provision expressly "negate[d] the zone-of-interests test (or, perhaps more accurately, expand[ed] the zone of interests)." Id. at 164. It based that conclusion on the language and evident purposes of the provision. First, the language used in the Endangered Species Act's "citizen suit" provision constituted "an authorization of remarkable breadth when compared with the language Congress ordinarily uses," even in other environmental statutes. See id. at 164–65. Second, the Court stated, its "readiness to take the term 'any person' at face value" was "greatly augmented by two interrelated considerations: that the overall subject matter of th[e] legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called 'private attorneys general.'" Id. at 165.

Section 1491(b) lacks such indicia of Congressional intent to "expressly negate[]" the application of the prudential standing doctrine in bid protests before the Court of Federal Claims. Unlike the Endangered Species Act, which authorizes a "citizen suit" by "any person," Congress, through the Tucker Act, has only permitted bid protests by "an interested party," i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382; see also Am. Fed'n of Gov't Emps., AFL-CIO v. United States (AFGE), 258 F.3d 1294, 1302 (Fed. Cir. 2001) (holding that an "interested party," for purposes of § 1491(b)(1), is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

Indeed, the "interested party" standard more closely resembles the "more restrictive formulations" contained in other environmental statutes, which the Court in Bennett suggested would be subject to prudential standing requirements. See 520 U.S. at 165 (citing as "more restrictive formulations" the following: the Clean Water Act, 33 U.S.C. § 1365(g) ("a person . . . having an interest which is or may be adversely affected"); the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270(a) (same); the Energy Supply and Environmental Coordination Act, 15 U.S.C. § 797(b)(5) ("[a]ny person suffering legal wrong because of any act or practice arising out of any violation of subsection (a) of this section"); and the Ocean Thermal Energy Conversion Act, 42 U.S.C. § 9124(a) ("any person having a valid legal interest which is or may be adversely affected")).

Further, the overall subject matter of § 1491 is not akin to the Endangered Species Act's subject matter—the environment—which the Court in Bennett stated was "a matter in which it is common to think all persons have an interest." Id. Rather, parties with a direct interest in the federal government's procurement process consist of the more limited group made up of offerors with an economic interest in the outcome of the procurement decision. Nor is § 1491 intended to create "private attorneys general" to enforce laws of broad application. See id. In short, this Court agrees with Judge Allegra's observation in Hallmark-Phoenix 3, LLC v. United States, that "neither the language of section 1491(b)[], nor its purpose, suggests that it should be read as negating the prudential standing doctrine." 99 Fed. Cl. 65, 70, appeal dismissed, 431 F. App'x 923 (Fed. Cir. 2011); but see Santa Barbara Applied Research, Inc. v. United States, 98 Fed. Cl. 536, 544 (2011).[12]

--------

[12] This Court respectfully disagrees with the conclusion of the court in Santa Barbara Applied Research, Inc. v. United States that prudential standing requirements are inapplicable to § 1491(b). In that case, the court observed that "[p]rudential standing is typically applied to challenges under the Administrative Procedure Act ("APA") 5 U.S.C. § 500 et seq., which has more liberal standing criteria than those set in section 1491(b)(1)." 98 Fed. Cl. at 544. It further observed that in AFGE, the Federal Circuit rejected what it characterized as the "'less stringent' standing requirements imposed under the APA in favor of the 'interested party' test." Id. (citing AFGE, 258 F.3d at 1302). Additionally, the court noted, "[u]nder AFGE, once a party satisfies the more stringent 'interested party' test, standing is established." Id. But the court's reasoning appears to be inconsistent with Bennett, which held that the default position is that prudential standing requirements apply broadly beyond the APA unless "expressly negated." Bennett, 520 U.S. at 163. And, the court in AFGE never reached the question of whether a zone of interests

13

Having determined that the Tucker Act does not expressly negate the prudential standing requirements in the context of a bid protest, the Court next applies the zone of interests test to the underlying statute that GSA allegedly violated, 40 U.S.C. § 3307. The Court concludes that Cleveland Assets' claim clearly does not fall within the zone of interests protected by § 3307(a). That provision requires GSA to secure the approval of Congressional Committees in order to obtain appropriated funds for leases above a set annual dollar amount. 40 U.S.C. § 3307(a). Its purpose is obviously to enable Congress to oversee how the money it appropriates is spent. See, e.g., Letter from the Comptroller General to the Acting Administrator, General Services Administration, B-176843, 52 Comp. Gen. 230 (Oct. 26, 1972) (opining that the Public Buildings Amendments of 1972, which added the lease provisions at issue herein, have the "apparent intent . . . to permit legislative oversight with respect to the more significant GSA lease transactions" and that "one of the major purposes of [this section] is to allow the Congress, through the appropriate committees, to exercise a degree of control over leasing arrangements"). The statute does not mention private parties or government contractors, and does not "remotely suggest[] an intent to confer a right to judicial review." Hallmark-Phoenix 3, LLC, 99 Fed. Cl. at 74; see also id. at 72 (noting that because statute was budgetary in nature and related to reports to Congress, plaintiff contractor was not proper party to seek adjudication of issues within statute's domain); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1377–78 (Fed. Cir. 2002) (concluding that an appropriations oversight provision contemplating enforcement, if any, through legislative spending adjustments did not provide for judicial enforcement); Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1375 (Fed. Cir. 1999) (en banc) (observing that it is not "the judicial role to discipline [an] agency's noncompliance with the supervisory and reporting instructions of congressional oversight." (citation omitted)).

Cleveland Assets' interest is in securing the award of a lease or in maintaining the FBI as a tenant under the existing lease. Its claims are not within the zone of interests protected by § 3307. Accordingly, Count II of Cleveland Assets' complaint must be **DISMISSED** without prejudice.[13]

---

test would apply because it concluded that the plaintiff in that case—a federal sector union—was not an "interested party" within the meaning of § 1491. See AFGE, 258 F.3d at 1302.

[13] The Court notes that it is in any event skeptical that Cleveland Assets has stated a claim for relief with respect to Count II, because the prohibition contained in § 3307 affects whether Congress will appropriate funds for the lease at issue, and not GSA's authority to solicit proposals for a lease. Cf. 210 Earll, LLC v. United States, 77 Fed. Cl. 710, 718 (2006) (holding that 40 U.S.C. § 3307 in combination with the Anti-Deficiency Act requires GSA to secure approval before executing a lease that exceeds the statutory thresholds, and rejecting argument that the lack of such approval bars an award of such a lease). Moreover, to the extent that the legal violation occurs when the lease is awarded or executed, Cleveland Assets' claim is not ripe for review, because it is possible that after discussions between GSA and the offerors, GSA will award a lease that does not include the structures Cleveland Assets claims are not identified in the prospectus. See Thomas v. Union Carbide Agric. Products Co., 473 U.S. 568, 580–81 (1985) (stating that the "basic rationale [of the ripeness doctrine] is to prevent the courts, through

**II.      Cleveland Assets' Motion to Supplement the Administrative Record**

In conjunction with its motion for judgment on the administrative record, Cleveland Assets filed a motion to supplement the record with the declaration and report of Robert Dietrich. ECF No. 25. Mr. Dietrich, a third party who performs market research and real estate analysis, prepared a report for this litigation setting forth his opinions regarding the reasonableness of the rental cap to which offerors are subject under the RLP. See id. The government opposes Cleveland Assets' motion. ECF No. 26.

It is well established that, in a bid protest case, the Court of Federal Claims is to "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents" to it. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (emphasis in original). Therefore, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). This limitation guards against the possibility that the court's scope of review will be transformed from an examination of the reasonableness of the agency's determination under APA standards "into effectively de novo review." Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).

In light of these principles and concerns, the court of appeals has held that in bid protests, "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Id. (quotation omitted). Examples of such cases include those in which extra-record evidence addresses matters of "a highly technical and complex nature" about which the agency and offerors are tacitly knowledgeable; or where it is necessary for the court to consider "information intentionally left out of the record, such as evidence of bias or bad faith"; or where there exists "relevant information, contained in the procurement files or generally known in an industry or discipline, which was inappropriately ignored by an agency." E. W., Inc. v. United States, 100 Fed. Cl. 53, 57 (2011) (citations omitted) (rejecting plaintiff's motion to supplement administrative record with declaration of plaintiff's corporate officer).

Here, the declaration and report of Mr. Dietrich do not fall within any of these categories; nor is consideration of Mr. Dietrich's opinions otherwise necessary for effective judicial review. The primary issue in this protest is whether GSA unduly restricted competition when it capped the maximum rental rate in the RLP at $26 per rentable square foot. Mr. Dietrich's declaration and report were not before GSA when it formulated the RLP. Considering Mr. Dietrich's disagreements with GSA's methodology and conclusions would involve this Court in a de novo review of the agency's actions, rather than in the limited APA-type review of their reasonableness. See Allied Tech. Grp., Inc. v. United States, 92 Fed. Cl. 226, 231 (2010) (denying supplementation with opinions regarding how the procurement should have been

---

premature adjudication, from entangling themselves in abstract disagreements" (internal quotation omitted)).

conducted, as this would have "transformed [the court's role] to <u>de novo</u> review"); <u>see also</u> <u>InGenesis, Inc. v. United States</u>, 104 Fed. Cl. 43, 48–50 (2012) (stating that "the question is not whether more information might have been available . . . but whether the additional evidence is necessary" (internal quotation and alteration omitted)). Accordingly, Cleveland Assets' motion to supplement the administrative record is **DENIED**.

### III. Cleveland Assets' Challenges to the RLP

#### A. <u>Standard of Review</u>

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." <u>Id.</u> at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." <u>Baird v. United States</u>, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." <u>A&D Fire Prot., Inc. v. United States</u>, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. <u>Bannum, Inc.</u>, 404 F.3d at 1356.

In a bid protest, the Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. <u>See</u> 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); <u>see also</u> <u>Bannum, Inc.</u>, 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. <u>See</u> <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting <u>Latecoere Int'l, Inc. v. U.S. Dep't of Navy</u>, 19 F.3d 1342, 1356 (11th Cir. 1994)); <u>see also</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. <u>Impresa Construzioni</u>, 238 F.3d at 1338.

**B.      The RLP's Maximum Rent Per Square Foot**

Under the Competition in Contracting Act, agencies must "create specifications that solicit proposals 'in a manner designed to achieve full and open competition.'" CW Gov't Travel Inc. v. United States, 99 Fed Cl. 666, 681 (2011) (quoting 41 U.S.C. § 3306(a)(1)(A)–(C)). Accordingly, an agency may include restrictive requirements in a solicitation only if they are necessary to meet the government's minimum needs. Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 435 (2015). The "agency's minimum needs," however, are "within the broad discretion of agency officials . . . and [are] not for the court to second guess." Savantage Fin. Servs. Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (internal quotation and alteration omitted). Therefore, where a plaintiff challenges a solicitation provision as unduly restrictive, it bears the burden of showing that the allegedly restrictive solicitation term "is so plainly unjustified as to lack a rational basis." Id. at 1286–87.

Cleveland Assets asserts that the RLP's maximum annual rental rate per square foot is unduly restrictive of competition. According to Cleveland Assets, GSA set the cap so low that no offeror who meets it will be able to meet the RLP's other requirements. See Pl.'s Mem. at 13–23; see also Compl. ¶¶ 33–34 (asserting that there are "no existing buildings that currently meet the specifications set forth in the RLP" and also that a new facility cannot be constructed based on the maximum rental rate). Cleveland Assets further claims that the local rental rates upon which GSA based the rental cap either did not include some of the cost components required by the RLP, did not involve properties comparable to the space the RLP requires, or were outdated. Pl.'s Mem. at 14–15; see also Compl. ¶¶ 11, 36. Relatedly, it alleges that the rental cap "improperly shifts all risk to the contractor and effectively deletes the technical evaluation factors." Compl. at 11. These arguments lack merit.

Contrary to Cleveland Assets' arguments, the record reveals that at each stage of the procurement process, GSA took reasonable steps to determine the appropriate rental cap rate. It did so before it submitted its prospectus to Congress in 2010, before it issued the RLP in 2016, and before the period for submitting offers expired earlier this year. Specifically, GSA commissioned an appraisal and conferred with OMB before it submitted the prospectus, and performed site visits and conducted market surveys before issuing the RLP. While the surveys, appraisal, and other documents yielded a variety of possible rental rates, there are several documents in the record which reflect and provide support for GSA's ultimate conclusion that it could secure adequate space for the FBI in the Cleveland business district (on a "turnkey" basis) for a rate of $26 per square foot or less.

For example, prior to issuing the final prospectus, GSA prepared an Analysis of Replacement Lease Rental Rate reflecting the results of an analysis that it conducted in collaboration with OMB. See AR Tab 45 at 656. This document reflects cost estimates that were based upon a "market analysis by [a] staff appraiser," and the use of the CoStar database. Id. The analysis yielded a rental rate of $26 per square foot. Id.[14]

---

[14] Cleveland Assets complains that the record does not contain the underlying documentation that served as the basis of the conclusions expressed in the Analysis of Replacement Lease Rental Rate. E.g., Pl.'s Mem. at 21. The Court notes, however, that there is a presumption "that

Further, the $26 rental cap is also supported by a more recent market analysis that GSA conducted at the beginning of this year, to update the work it did in preparing the prospectus. Based on that analysis, which is described above and is documented in detail in the record, GSA calculated an average asking rental rate for office buildings in the Cleveland business district of $21.30 per square foot based on 2016 year-end data. Id. Tab 54 at 681. This further supports the reasonableness of GSA's $26 rental cap.

Cleveland Assets argues nonetheless that this Court should set aside GSA's decision to set the cap at $26 per square foot on the grounds that GSA employed flawed methodologies to reach that figure. But the choice of methodologies used to set the rental cap is a matter that is squarely within GSA's discretion. See McConnell Jones Lanier & Murphy LLP v. United States, 128 Fed. Cl. 218, 235–36 (2016) (noting agency's broad discretion to determine methodology for price analysis); Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009) (same); see also Tri-States Serv. Co., B-216024, 84-2 CPD ¶ 432 (Comp. Gen. Oct. 22, 1984) (upholding price ceiling because determination of agency's minimum needs was within its discretion, "there was more than adequate competition," and "while [the plaintiff did] not agree with the Army's determination . . . , such difference of opinion [was] not sufficient to upset the Army's determination"); Knoll Int'l, B-210256, 83-1 CPD ¶ 317 (Comp. Gen. Mar. 28, 1983) (holding that determining government's minimum needs is within discretion of agency and refusing to disturb price ceiling reached after consultation with industry and users).[15] The Court therefore declines Cleveland Assets' invitation to get into the weeds and second-guess GSA's determinations regarding which properties and rental rates in the Cleveland business district should serve as comparators for the agency in conducting its market analyses.

Further, even if GSA's analysis of the market were as imperfect as Cleveland Assets contends, the Court would still be reluctant to conclude that a $26 per square foot rental cap is "so plainly unjustified as to lack a rational basis." For one thing, there is no question that "[a]n agency may appropriately impose price ceilings or mechanisms on a contractor that maximize the risk to the contractor and minimize the risk to the Federal Government or its beneficiaries." Am. Safety Council, Inc., 122 Fed. Cl. at 440 (citing Sims v. United States, 112 Fed. Cl. 808, 817 (2013)). And it seems self-evident that the government should not be precluded from issuing an RLP to test the waters regarding whether it can secure rental space at the lowest possible rate, even a below-market rate. See Gould, Inc. v. United States, 66 Fed. Cl. 253, 261 (2005) (noting that it is "the obligation of [every] Government agency . . . to protect the fisc"); see also

---

public officers have properly discharged their official duties." Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003). The Court, accordingly, will presume that GSA's estimates were based on an analysis performed by one of its appraisers using the cited commercial real estate database.

[15] Although GAO opinions are not binding on the Court of Federal Claims, the Court "may draw on GAO's opinions for its application of [its] expertise." See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); see also Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 503 (2005) (noting that GAO decisions are not binding on the court but "are persuasive").

Intersport Fashions W., Inc. v. United States, 84 Fed. Cl. 454, 463 (2008) (observing that the government has a "substantial interest in protecting the public purse" (quoting Flora v. United States, 362 U.S. 145, 175 (1960))); Wheeler Bros., Inc., B-212158, 84-1 CPD ¶ 480 (Comp. Gen. Apr. 25, 1984) (noting that government's primary interest is "fulfilling its minimum needs at the lowest possible cost").

Moreover, Cleveland Assets' claim—that no offeror will be able to comply with the RLP's requirements and also meet the rental cap—is at this point highly speculative. First, while not dispositive, it is relevant to note that there have been [***] offers made in response to the RLP, including one from Cleveland Assets itself. See Pl.'s Mem. at 24–26; Def.'s Mot. at 10–11; see also AR Tabs 24–25, 28–30; Am. Safety Council, Inc., 122 Fed. Cl. at 436 (noting that receipt of multiple proposals "undercut[s] the argument that the terms are unduly restrictive"); Supreme Foodservice GmbH, B-404400.1 et al., 2011 CPD ¶ 244 (Comp. Gen. Oct. 31, 2011) (finding that submission of multiple proposals required GAO to conclude that protester failed to show terms of solicitation prevented a responsible source from submitting proposal). Second, Cleveland Assets ignores that modifications of at least some of the lease requirements may also be negotiated as part of the discussion and proposal revision process. See AR Tab 8 at 75.[16]

In addition, the RLP provides that GSA will evaluate the prices of the offers received. See id. at 76, 80–81.[17] Thus, once GSA has completed the evaluation process, following discussions with offerors and receipt of final proposal revisions, GSA will be able to assess the potential risks of adhering to the rental cap and exercise its considerable discretion to determine whether those risks are worthwhile. FCN, Inc. v. United States, 115 Fed. Cl. 335, 375 (2014) (stating that "an assessment of potential risk associated with a proposed price [is] generally within the sound exercise of the agency's discretion" (quoting Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 (2013))).

Finally, it also bears noting that, in this case, GSA has legitimate reasons independent of market considerations to seek offers that comply with a rental cap of $26 per square foot. Specifically, GSA has no appropriations available to pay a rent higher than $26 per square foot

---

[16] Indeed, the Court notes that GSA appears to have contemplated alternative methods of funding improvements or alterations to any proposed building outside of TI reimbursement in the rental rate. See AR Tab 1 at 5 (Project Management and Acquisition Plan indicating an "RWA" was "anticipated . . . for any and all tenant improvements and potentially move costs"). An RWA is a reimbursable work authorization for GSA to alter, renovate, repair or provide services in a leased space "over and above the basic operations financed through rent." General Services Administration, About RWAs, GSA, https://www.gsa.gov/portal/content/101517 (last visited May 18, 2017). RWAs are paid for by the tenant agency. Id.

[17] Although in its Source Selection Plan GSA stated that the contracting officer would "use price analysis as stated in the RLP to evaluate the price, not only to determine whether it is reasonable, but also to determine whether the Offeror understands the work and has the ability to reasonably identify costs needed to successfully perform the contract," and referred to FAR 15.305(a)(1) and FAR 15.404, AR Tab 2 at 22–23, the RLP itself is silent as to any methodology for evaluating offerors' proposed prices, see id. Tab 8 at 75–82.

because that is the rental rate prescribed in the prospectus Congress approved. Having been unsuccessful in its efforts to negotiate acceptable terms for a new lease with Cleveland Assets, see AR Tab 1 at 2, it was hardly irrational for GSA to solicit offers from other prospective lessors who might provide space that meets the FBI's needs at a rate that does not exceed the $26 cap.[18]

In short, the Court rejects Cleveland Assets' argument that the rental cap is unduly restrictive of competition or otherwise irrational. Accordingly, the government is entitled to judgment on the administrative record as to Counts III and IV of Cleveland Assets' complaint.

**CONCLUSION**

For the reasons set forth above, Cleveland Assets' motion to supplement the administrative record is **DENIED**. Counts I and II of Cleveland Assets' complaint are **DISMISSED** without prejudice for lack of standing. Cleveland Assets' motion for judgment on the administrative record with respect to the remaining counts is **DENIED** and the government's cross-motion with respect to the remaining counts is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**


s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[18] GSA's other options included filling its needs for space in an alternative, less desirable location or securing approval of a new prospectus while continuing to pay rent to Cleveland Assets at penalty rates. But securing approval of a new prospectus is a lengthy process. The Court notes that in addition to the time it took for GSA to prepare the final prospectus it submitted to Congress, it took nine months from submission to the Committees for GSA to receive final approval of it. Compare AR Tab 51 at 675, with id. Tab 53 at 679. In fact, the statute contains no specific requirement that Congress ever act on the prospectus. See 40 U.S.C. § 3307. And while it is conceivable that TI costs could be subsidized by contributions from the FBI (see note 16, supra), that would require the FBI to dip into its own limited appropriations for that purpose.